UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GREATER ST. LOUIS CONSTRUCTION LABORERS WELFARE FUND, et al., | ) ) ) |
| Plaintiffs/Counterclaim Defendants, | ) ) |
| v. | ) Case No. 4:09CV00401 ERW ) |
| SYMMETRY LANDSCAPING, INC., and SYMMETRY DESIGN and INSTALLATION, LLC, | ) ) ) ) ) |
| Defendants/Counterclaim Plaintiff. | ) |

## PLAINTIFFS' POST-TRIAL BRIEF

Plaintiffs bring this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132, and the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. §185, seeking to collect delinquent fringe benefit contributions owed by defendant to the Construction Laborers Benefit Funds (the "Funds") pursuant to the terms of collective bargaining agreements between Laborers Locals 42-53-110 (the "Union") and defendants Symmetry Landscaping, Inc. ("SL, Inc.") and Symmetry Design and Installation, LLC ("SD&I, LLC"). This matter was tried before the Court on January 23, 2012, and all parties appeared.

## FACTS

During the time period relevant to this action, defendant SD&I, LLC was a party to collective bargaining agreements with the Union and the Modular Block Wall Contractors of the Landscaping Division of SITE Improvement Association (collectively hereafter referred to as the "Modular Block Wall Agreements"). Defendant SL, Inc. was a party to a collective bargaining agreement with the Seed/Sod and Nursery Contractors Division of the Landscaping Division of the

1

SITE Improvement Association (the "Seed/Sod Agreement"), and executed an addendum to the Seed/Sod agreement covering work involving installation of irrigation systems (the "Irrigation Addendum") by signing the name "Symmetry Irrigation" on the Irrigation Addendum's signature page.  The Modular Block Wall Agreements and the Irrigation Addendum to the Seed/Sod Agreement require employers to make contributions to the Construction Laborers Welfare, Pension and SITE Advancement Funds on the basis of all hours worked by covered employees, and require employers to submit monthly contribution report forms, authorize the Funds to audit the payroll and related records of employers to determine whether the required contributions have been made, and require payment of 10% liquidated damages on delinquent contributions, as well as interest, attorneys' fees, court costs and payroll examination fees if suit is filed to enforce the agreements.

The Funds hired independent accountants to perform a payroll examination of the books and records of SL, Inc. and SD& I, LLC for the period of July 1, 2005 through February 28, 2009.  In that financial examination, the accountants determined that SL, Inc. and SD&I, LLC failed to report a total of 4,950.08 hours.  Of those hours, 1,792.08 were attributable to work performed under the Modular Block Wall Agreements and 3,158.00 were attributable to work performed under the Irrigation Addendum to the Seed/Sod Agreement.  The value of these under-reported hours totals $35,676.23, which is comprised of $26,202.30 in contributions, $4,317.29 in liquidated damages and $5,156.64 in interest calculated through August 31, 2010.

Defendants filed a counterclaim asserting their right to $11,400.00 in benefit contributions for amounts they allegedly overpaid to the Funds.  Defendants produced a report detailing the hours they claim were over-reported.  Defendants claim that they are not liable for any hours worked

under the Irrigation Addendum because defendant's principal signed the Addendum under the name "Symmetry Irrigation," who is not a party to this case.

## ARGUMENT

Pursuant to 29 U.S.C. §1132(g)(2), plaintiffs are entitled to recover all of the principal contributions owed pursuant to the payroll examination, plus liquidated damages, interest, attorneys' fees, and costs. *Contractors, Laborers, Teamsters and Engineers Health and Welfare Plan v. Hroch*, 757 F.2d 184 (8th Cir. 1985); *Landy Packing Co. v. Meatcutters*, 471 F.Supp. 1218 (D.Minn. 1979), *aff'd*, 627 F.2d 881 (8th Cir. 1980); *Operating Engineers Pension Fund v. Reed*, 726 F.2d 513, 514 (9th Cir. 1984) (award of liquidated damages mandatory).

    I.      SYMMETRY LANDSCAPING, INC. IS LIABLE FOR IRRIGATION HOURS

Defendant SL, Inc. is liable for benefit contributions required by the Irrigation Addendum even though the name "Symmetry Irrigation" appears on the signature page[1]. A nonsignatory entity may adopt a labor agreement through conduct manifesting an intention to be bound. *Greater St. Louis Construction Laborers Welfare Fund, et al. v. Don Richardson Concrete Co.*, 775 F. Supp. 1249, 1253 (E.D. Mo. 1991). In an ERISA delinquency case, intent to be bound may be evidenced where an employer submits reports and contributions in connection with a collective bargaining agreement. *Id.* In this case, defendants submitted reports and contributions for work performed under the Irrigation Addendum under the name Symmetry Landscaping, Inc. The Funds' Administrative Manager testified that a review of the Funds' records did not reveal any reference to an entity by the name of Symmetry Irrigation. In addition, John Massa testified

---

[1] Defendants claim that only Symmetry Irrigation, LLC, an entity not a party to this action, would be liable for the hours worked under the Irrigation Addendum. All agreements relative to this action were executed by defendants' principal, Theodore J. Bergman.

that none of the records he reviewed in performing the field work for the payroll examination referenced Symmetry Irrigation.  For these reasons, defendant SL, Inc.'s conduct clearly manifested an intention to be bound by the terms of the Irrigation Addendum.

Defendant SL, Inc. is also liable for the hours worked under the Irrigation Addendum because SL, Inc. and Symmetry Irrigation, LLC ("SI, LLC") are a single employer.  Under a single employer theory, one business entity may be bound by another entity's contractual obligations where the two entities acted as a single, integrated enterprise.  A single employer analysis is appropriate where two business entities that operated concurrently should be held to a single labor obligation.  *Iowa Express Distribution, Inc. v. NLRB,* 739 F.2d 1305, 1310 (8th Cir. 1984).  In cases involving labor agreements, courts find a single employer relationship through the analysis of four factors:  1) interrelation of operations; 2) common management; 3) centralized control of labor relations; and 4) common ownership.  *Radio & Television Broadcast Local 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256 (1965).  No one of the factors is controlling nor need all criteria be present; single employer status ultimately depends on the facts and circumstances of an individual case.  *Iowa Express Distribution, Inc. v. NLRB, supra*, 739 F.2d at 1310, citing *Penntech Papers Inc. v. NLRB,* 706 F.2d 18, 25 (1st Cir. 1983).

Under the labor law analysis, this case is controlled by this Court's opinion in the factually similar case, *Beetz v. R.W. Hodges Plumbing, Inc.*, Case No. 4:91CV1964 (E.D. Mo. 1993) (unpublished opinion, attached).  In that case, the Plumbers Union had a CBA with Parkway Plumbing Services, Inc. ("Parkway"), a corporation whose incorporators, owners and officers and directors were a husband and wife. *Beetz* at ¶¶4, 8.  Approximately the time Parkway ceased doing business, the son of its incorporators established R.W. Hodges Plumbing,

Inc. ("Hodges"). *Beetz* at ¶¶10, 13. The two companies had separate employer identification numbers, incorporators and officers and directors and filed separate tax returns. *Beetz* at ¶¶5, 6, 25-26. Moreover, the father took a 20-30 hour per week job with another business for approximately four months, and then took a full-time job elsewhere shortly thereafter. *Beetz* at ¶39. The father never supervised or directed his son's employees. *Beetz* at ¶37(c). However, the businesses shared the services of the same attorney and used some of the same employees. *Beetz* at ¶¶34-36. The father was a master plumber for Hodges. *Beetz* at ¶38. In addition, the son was authorized to and occasionally did sign checks for Parkway and Hodges paid invoices written in the name of Parkway. *Beetz* at ¶¶17-18, 20-22, 30. Also, Hodges worked out of the father's property. *Beetz* at ¶14.

The Court held that Parkway and Hodges were alter egos[2], largely because the businesses shared key employees (among them the father, mother, son and son's wife), they used the same facility and sources of business support, they had substantially the same customers and the incorporation of Hodges occurred to avoid the debt of Parkway. *Beetz* at p. 17-18. "Clearly, the incorporation of Hodges, Inc. was an attempt by Ronald Hodges [the son] to continue as a key person in a plumbing contracting business without the debt that burdened Parkway." *Id*. at 19.

At trial, defendants' principal Theodore Bergman explained that he and his spouse jointly owned SL, Inc. and that SL, Inc. was the sole owner of several limited liability companies, including defendant SD&I, LLC and SI, LLC. He testified that all of these businesses involved some aspect of horticultural work, and that it was not unusual to perform work that would fall

---

[2] This case involved an alter-ego analysis instead of a single employer analysis, however, both analyses have similar elements; the alter-ego theory is appropriate where successorship is in issue, while the single employer theory is more appropriate where the two comparable entities operated simultaneously. *Iowa Express Distribution, Inc. v. NLRB,* 739 F.2d 1305, 1310 (8th Cir. 1984).

under more than one of the collective bargaining agreements on a single jobsite. In addition, laborers sometimes worked for more than one entity. Also, SL, Inc., SD&I, LLC and SI, LLC all shared the same CFO, General Operations Manager (who controlled labor relations) and office manager. All of the entities operated out of the same office location. In addition, the fact that defendants reported hours covered by the Irrigation Addendum to the Funds' office under the name SL, Inc. further evidences defendants' failure to properly distinguish its own entities.

## II. PLAINTIFFS' EXAMINATION REPORT IS ACCURATE

Defendants failed to produce sufficient evidence disputing the calculations of plaintiffs' accountants. Wolfe-Nilges-Nahorski ("WNN"), the accounting firm that performed the payroll examination, has been performing payroll examinations for plaintiffs and other Taft-Hartley Funds for decades. Both R. Christopher Madison and John Massa of WNN testified to the host of documents that are reviewed and analyzed in preparing the examination reports. WNN prepared a preliminary examination report after defendants responded to its initial information request. After the preliminary report was issued, defendants had – and took advantage of – the opportunity to produce more evidence that would contradict WNN's findings. Based on this additional information, WNN modified the report prior to issuing the final examination report that is before this Court. At trial, Mr. Bergman testified that defendants attempted to contact WNN after the final examination report was issued, but was referred to plaintiffs' counsel; he then admitted that he (or anyone acting on defendants' behalf) made no effort to communicate with counsel regarding specific issues with the report. Finally, Mr. Bergman testified that he found some documentation that may have warranted a revision of the examination calculations, however, that documentation was uncovered just before trial. Significantly, defendants did not

ever produce that documentation to plaintiffs, did not list that documentation as an exhibit, and did not present that documentation as evidence in support of their conclusion that WNN financial examination was deficient.

Massa testified that, in some instances, he relied on job proposals to determine the number of reportable hours. He explained that he did so because the proposal was the only available information provided by defendants. This Court has held that such assumptions are reasonable, particularly where defendants do not timely provide contradictory evidence or where evidence is uncorroborated. See Memorandum in *Greater St. Louis Construction Laborers Welfare Fund, et al. v. D&H Concrete, Inc.,* No. 4:05-CV-2352(CEJ) [Doc. 69], 2008 U.S. Dist. Lexis 46016 (copy attached), quoting *Greater St. Louis Construction Laborers Welfare Fund, et al. v. Don Richardson Concrete Co., supra,* 775 F. Supp. at 1254: "[The Court will not permit defendant] to reduce its liability by alluding to inaccuracies when the fault for the inaccuracies lies squarely in defendant's lap." In this case, if defendants had additional documentation or evidence purporting to contradict the findings of plaintiffs' accountants, it should have been produced after the preliminary examination report was issued, and at the latest, immediately after the final payroll examination report was issued in August 2010.

Bergman testified that, with regard to a few projects, someone on behalf of defendants called Union Business Representative Richard Casson to determine if certain projects would be covered work, that Casson relayed that the questioned work would not be covered, and that those "non-covered" hours were still included in the payroll examination report. Bergman's vague testimony did not identify the date and time of these calls or the individual calling on defendants' behalf. Casson credibly testified that 1) he did not recall any such conversations; 2) he

habitually keeps written records of his communications with all employers; 3) he reviewed his notes for the relevant time period prior to trial; 4) his notes did not reflect any such conversations; and 5) he had personally visited one of the jobs for which defendants disputed hours (the "First Bank" job in Webster Groves) and observed employees performing covered work.

Assuming, *arguendo,* that Casson did in fact make the alleged representations regarding the scope of covered work, such representations are irrelevant. Oral modifications of a collective bargaining agreement by a union representative are not enforceable; the written agreement controls. *Maxwell v. Luck Construction Co.,* 710 F.2d 1395, 1398 (9th Cir. 1983); *Mo-Kan Teamsters Pension Fund v. Creason,* 716 F.2d 772, 777 (10th Cir. 1983), cert. denied, 464 U.S. 1045 (1984). Defendants presented no corroborated evidence that the payroll examination report contained hours for work not covered under a collective bargaining agreement requiring contributions to the Funds.

III.     DEFENDANTS ARE NOT ENTITLED TO A REFUND

Defendants claim that plaintiffs owe them $11,400.00 for 1,618.71 hours that were allegedly over-reported. Defendants offered a spreadsheet purporting to support this contention.[3] This spreadsheet lists hours worked by employee, by month, and identifies supposed over-reported hours in the far right column in parentheses.

After a thorough review of defendants' spreadsheet and comparison to plaintiffs' examination report, even when coupled with trial testimony, it is not clear how defendants

---

[3] Defendants offered this spreadsheet as Defendant's Exhibit A at trial; it is numbered as Exhibit A-3 on defendants' Exhibit List.

arrived at the figure of 1,618.71 hours. As confirmed by the trial testimony of plaintiffs' accountants, defendants were credited with many of the hours for which they claim (based on their spreadsheet) they are owed.[4] In fact, there are some months where plaintiffs credited defendants with more hours than those defendants are claiming, or where defendants made no demand at all. In addition, Massa (who performed the field work for the payroll examination), concluded that defendants' spreadsheet could not be relied upon due to specific errors he noticed on the spreadsheet. Defendants' spreadsheet illustrates only one thing: why it is so necessary to have an independent accounting firm review an employer's payments to the Funds for accuracy.

No matter how many hours defendants may or may not have over-reported, plaintiffs' payroll examination calculates a total of 4,950.08 underreported hours. Even if defendants could establish that they should recover the value of 1,618.71 hours (which, as defendants' principal testified at trial, they "estimated" at $11,400.00), they are not entitled to a refund.

ERISA requires defendants to establish that alleged overpayments were made as a "mistake of law or fact." 29 U.S.C. §1103(c)(2)(A)(ii). Defendants have not produced any evidence concerning the reason for the alleged overpayments. Further, even if defendants could produce any evidence of mistake of law or fact, plan administrators have discretion as to whether or not a refund will be issued; refunds are not mandatory or automatic. *E.M. Trucks, Inc. v. Central States, Southeast and Southwest Areas Pension Plans,* 517 F.Supp. 1122, 1124 (D. Minn. 1981).

---

[4] Stated another way, plaintiffs' accountants offset the overpayments against defendants' underpayments for purposes of the payroll examination report.

Though defendants have not articulated such a position, they may seek recovery of mistaken payments under an unjust enrichment theory. In *Young America, Inc. v. Union Central Life Ins. Co.*, 101 F.3d 546 (8th Cir. 1996), the Eighth Circuit agreed that an employer "has a federal common law action for restitution of mistakenly made payments to an ERISA plan." 101 F.3d at 548. However, even when there is no dispute that the payments were mistakenly made, the employer seeking restitution must still satisfy the principles of restitution to get its money back. *OE 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645 (7th Cir. 2001). "Recovery will not follow automatically upon a showing that the [employer] contributed more than was required but only if 'the equities favor it.'" *UIU Severance Pay Trust Fund v. Local Union No. 18-U*, 988 F.2d 509, 512-13 (7th Cir. 1993) (internal citation omitted). The Eighth Circuit in *Young America, Inc.*, 101 F.3d at 548, referred to the *UIU Severance Pay Trust Fund* case for the factors that should be considered when determining if restitution is equitable under the circumstances:

> (1) are unauthorized contributions the sort of mistaken payments that equity demands be refunded? (2) has the [employer] delayed bringing this action for so long that laches, or other equitable defense, bars recovery? (3) in the same vein, has the [employer], by continuing the payments for years without apparent question, somehow ratified past payments? and (4) . . . can the [employer] demonstrate that the party from whom it seeks payment would be unjustly enriched if recovery is denied?

988 F.2d at 513.

In making the restitution inquiry, the Eighth Circuit in *Young America* made clear that "[p]remiums for any periods of coverage were not mistakenly paid and should not be refunded." *Id*. at 549. This position is supported in numerous courts from other circuits which have likewise

held that a refund (or offset) is not appropriate where the benefits paid for were in fact provided or if the employer received a benefit from the payments. See, e.g. *OE 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645 (7th Cir. 2001) (restitution inequitable if payor obtained a benefit from the payment and now seeks to take back that payment); *Alaska Trowel Trades Pension Fund v. Lopshire*, 103 F.3d 881 (9th Cir. 1996) (no restitution for amounts paid because the employees received the benefits for which the employer made the contributions); *Brown v. Health Care and Retirement Corp.*, 25 F.3d 90 (2nd Cir. 1994); *Construction Ind. Retirement Fund v. Kasper Trucking, Inc.*, 10 F.3d 465, 467 (7th Cir. 1993) (employer could not get money back from welfare fund because the welfare fund had furnished employees with insurance). As the Seventh Circuit stated in *Construction Ind. Retirement Fund v. Kasper Trucking, Inc.*, 10 F.3d at 467: "Just as a person who buys term life insurance may not obtain a 'refund' if he survives the term, so a person who pays for health insurance cannot get his money back if he remains healthy."

In the present case, defendants presented no evidence to show that the employees for whom the allegedly excess payments were made did not receive the benefit for which the employer paid. Unlike many of the other cases in which the issue of restitution is discussed, in this case, the individuals on whose behalf the contributions were made were eligible for coverage by the Funds and received credit for all of the contributions made on their behalf. As the Funds' Administrative Manager Bernard Difani testified at trial, employees for whom contribution payments were made were individually credited with those payments, receiving health insurance coverage from the Welfare Fund and receiving pension credits from the Pension Fund. Therefore, the Funds were in no way "unjustly enriched" by the allegedly mistaken overpayments.

## **CONCULUSION**

Defendant SL, Inc. is liable for all hours worked under the Seed/Sod Agreement, including those under the Irrigation Addendum.  Even though defendants' principal executed the Irrigation Addendum under the name "Symmetry Irrigation," SL, Inc. manifested an intent to be bound by the Irrigation Addendum through its conduct.  Further, SL, Inc. is liable for hours worked under the Irrigation Addendum because SL, Inc. and SI, LLC are single employers.  Defendants did not present credible evidence contradicting the findings of the payroll examination, and defendants are not entitled to a refund of any alleged overpayments.  For these reasons, defendants are liable to plaintiffs in the total amount of $58,806.73, which is comprised of $26,202.30 in contributions, $4,317.29 in liquidated damages, $5,156.64 in interest, $13,600.50[5] in payroll examination costs, and $9,530.00[6] in attorneys' fees and court costs.

Respectfully submitted,

HAMMOND & SHINNERS, P.C.
7730 Carondelet, Suite 200
St. Louis, Missouri  63105
(314) 727-1015 (Phone)
(314) 727-6804 (Fax)
eperez@hammondshinners.com


    /s/ Emily R. Perez
EMILY R. PEREZ, #5205502
SHERRIE A. SCHRODER, #4307MO
Attorneys for Plaintiffs

---

[5] Plaintiffs' Trial Ex. 10

[6] Suppl. Aff. of Emily R. Perez, attached.

## **CERTIFICATE OF SERVICE**

      The undersigned certifies that a copy of the foregoing was filed on February 2, 2012 with the Court's Electronic Filing System for service upon:

Mr. Ken Heinz
Curtis, Heinz, Garrett and O'Keefe, P.C.
130 South Bemiston, Suite 200
St. Louis, MO 63105
kheinz@lawfirmemail.com


                                                                    /s/ Emily R. Perez_____